UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:10-cr-535-T-26TBM

UNITED STATES OF AMERICA

-vs-                                              12 August 2011
                                                     9:30 a.m.
ERNEST BLANCO, JR.,                              Courtroom 15B
a/k/a NESTOR BLANCO,

         Defendant.
-----------------------/

TRANSCRIPT OF PROCEEDINGS
*(SENTENCING HEARING)*
BEFORE THE HONORABLE RALPH A. LAZZARA,
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES

For the Government:    WALTER E. FURR, III, ESQUIRE
                       *Assistant United States Attorney*
                       *United States Attorney's Office*
                       400 North Tampa Street
                       Suite 3200
                       Tampa, Florida 33602
                       Phone: (813) 274-6324
                       Fax: (813) 274-6108
                       walter.furr@usdoj.gov

For the Defendant:     ANGELO MICHAEL FERLITA, ESQUIRE
                       *Angelo M. Ferlita, P.A.*
                       610 West Azeele Street
                       Tampa, Florida 33606
                       Phone: (813) 254-7047
                       ferlitalaw@yahoo.com

*(appearances continued on next page)*

STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION

```
ALSO PRESENT          ERNEST BLANCO, JR. (Defendant)
                      IGNACIA ESTABAN (Case Agent)
                      CHRIS CASTELLANO (Probation Officer)
                      SUSAN SAYLOR (Courtroom Deputy Clerk)
                      LISA BINGHAM (Courtroom Deputy
                          Clerk in Training)
                      FRED BOHLIG (Court Security Officer)


REPORTED BY           SHERRILL L. JACKSON, RPR, FPR
                      Federal Official Court Reporter
                      801 North Florida Avenue
                      Suite 13A
                      Tampa, Florida 33602
                      Phone:  (813) 301-5041
```

### INDEX TO PROCEEDINGS

Page

CERTIFICATE OF REPORTER...................................63

### INDEX TO EXHIBITS

(None offered or received)

```
 1              P R O C E E D I N G S        (9:30 a.m.)

 2              THE COURT:  Madam Clerk, would you call the case,

 3     please.

 4              THE CLERK:  8:10-cr-535-T-26TBM, United States of

 5     America vs. Earnest Blanco, Jr.

 6              Counsel, please state your appearances.

 7              MR. FURR:  Good morning.  Terry Furr for the

 8     United States.

 9              THE COURT:  Good morning.

10              MR. FERLITA:  Angelo Ferlita on behalf of

11     Mr. Blanco.

12              THE COURT:  All right.  Mr. Ferlita, you may

13     remain seated.

14              MR. FERLITA:  Thank you, Your Honor.

15              THE COURT:  Mr. Blanco, would you please stand to

16     be sworn by the clerk.

17              (The Defendant was duly sworn or affirmed and

18     responded as follows:)

19              THE DEFENDANT:  I affirm, yes, ma'am.

20              THE CLERK:  You're Ernest Blanco?

21              THE DEFENDANT:  Nestor Blanco, Jr.

22              THE COURT:  Is your first name "Ernest"?

23              THE DEFENDANT:  Well, that's not my real name.

24              THE COURT:  What's your true name?

25              THE DEFENDANT:  Nestor, N-E-S-T-O-R, Blanco, Jr.
```

1          THE COURT:  All right.  Well, Mr. Blanco, as you

2    know, we're here for your sentencing.  During the course of

3    this proceeding, you may be asked some questions.  If you're

4    asked a question and you choose to answer, do I have your

5    assurance that you'll answer all questions truthfully and

6    completely?

7          THE DEFENDANT:  Yes, sir, Your Honor.

8          THE COURT:  As you also know, on March 29th of

9    this year, you appeared before me and you pled guilty to

10   Count 6 of the indictment, which charged you with being a

11   felon in possession of a firearm, in violation of federal

12   law.  I accepted your guilty plea, and I adjudged you to be

13   guilty of that offense.

14          We're now at the stage of the proceedings where

15   it's my obligation to address questions to you, to your

16   attorney, and the Assistant United States Attorney.

17          Mr. Ferlita, prior to this proceeding, did you

18   have an opportunity to receive and thereafter to review or

19   discuss with your client the contents of the presentence

20   report?

21          MR. FERLITA:  Yes, I have, Your Honor.  Also, I

22   received an amended addendum to the presentence report that

23   I have reviewed with Mr. Blanco.

24          THE COURT:  All right.  Mr. Blanco, prior to this

25   proceeding, did you, in fact, have an opportunity to confer

1    with Mr. Ferlita and to review and discuss with him your

2    presentence report?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  All right.  Now, there is -- there has

5    been a five-level upward adjustment -- where is it? -- I'm

6    sorry, four-level, under 2K 2.1(b)(6) because it's claimed

7    that he used a firearm in connection with another felony

8    offense, that is, a burglary.

9              As I understand it, those are pending in Circuit

10   Court -- where is it? -- in Pasco County, dealing with

11   stolen property, grand theft; correct?

12             MR. FERLITA:  That's correct, Your Honor, as far

13   as I am aware.

14             THE COURT:  Are you represented in that case by

15   counsel, Mr. Blanco?

16             THE DEFENDANT:  Yes, sir, Your Honor.

17             THE COURT:  Who is that?

18             THE DEFENDANT:  His name is Mark -- Marco Joseph.

19             THE COURT:  And is he an assistant Public Defender

20   there?

21             THE DEFENDANT:  He's a private attorney from

22   Tampa.

23             THE COURT:  Did you retain him?

24             THE DEFENDANT:  No.  I think he was appointed by

25   the Court.

```
 1              THE COURT:  Okay.  What's the status of that case
 2    over there?
 3              THE DEFENDANT:  He just told me that he didn't
 4    understand why I was brought over here, and then he found
 5    out, you know, why I was here, and then -- and then he --
 6              THE COURT:  Well, when is your next court
 7    appearance over there?  Do you know?
 8              THE DEFENDANT:  I think it's something like --
 9    they said August 30th or something like that.  If --
10              THE COURT:  Mr. Furr, are you prepared to put on
11    testimony with regard to this?
12              MR. FURR:  I'll put the agent on.
13              THE COURT:  Okay.
14              Agent, would you come forward, please.
15              (The witness was duly sworn or affirmed and
16    responded as follows:)
17              THE WITNESS:  Yes.
18              THE CLERK:  Please have a seat in the witness box.
19              THE WITNESS:  (Seated.)
20              THE CLERK:  Please state your name and spell your
21    fast name for the record.
22              THE WITNESS:  Ignacio Estaban, E-S-T-A-B-A-N.
23              THE CLERK:  Thank you.
24                        IGNACIO ESTABAN,
25    the witness, being sworn or affirmed, testified as follows:
```

```
 1                        DIRECT EXAMINATION
 2            MR. FURR:  May I proceed?
 3            THE COURT:  Oh, yes, sir.  Go ahead.
 4   BY MR. FURR:
 5   Q    Mr. Estaban, when did you first speak with the
 6   Defendant, what date?  Do you recall?
 7   A    May 23rd, 2010.
 8   Q    And how -- did you speak to him face to face or over
 9   the phone or what?
10   A    I spoke to him over the phone.  I had received a text
11   message from Ray Alexander in reference to some items,
12   weapons, and I talked to Ray Alexander, and then he put me
13   on the phone with an individual I later identified as Nestor
14   Blanco.
15   Q    And what was your conversation with Mr. Blanco?
16   A    It was in reference to some weapons they had acquired
17   and the description of the kind of weapons they had,
18   different kinds of rifles, shotguns, et cetera, and looking
19   for a price to sell these weapons for and a date we can meet
20   so I can buy them.
21   Q    At approximately what time did this conversation occur?
22   A    There were a couple of conversations.
23   Q    The initial one with Mr. Blanco?
24   A    Around 6:05 p.m. and another one later around 7 p.m.
25   Q    But did you talk to Mr. Blanco at 6:00 or --
```

```
 1   A    Briefly and then when I called back later to get how

 2   much the price of the weapons I wanted to sell, and then I

 3   spoke directly with Mr. Blanco.

 4   Q    All right.  And did you later actually purchase the

 5   weapons from Mr. Blanco and another individual?

 6   A    Yes, I did.

 7   Q    And that's the basis for this case; right?

 8   A    That's correct.

 9   Q    And you did that in a hand-to-hand fashion?

10   A    Yes.  He did remove some of the weapons from the

11   dresser with Ray Alexander, rifles and shotguns that he gave

12   directly to me.

13   Q    All right.  And did you then pay either Mr. Alexander

14   or Mr. Blanco?

15   A    Yes.  I paid Ray Alexander $4500, counted the money,

16   and then he gave Mr. Blanco $2,000 of that $4500.

17   Q    All right.  Now, had you had previous dealings with

18   Mr. Alexander?

19   A    Yes.  I would say a little less than a year I've been

20   dealing with Ray Alexander and purchasing weapons and drugs

21   from him.

22   Q    Now, you said that you first spoke to Mr. Alexander at

23   what time -- excuse me, Mr. Blanco at what time on that

24   date?

25   A    On May 26th?
```

```
 1   Q      Mm-hmm.

 2   A      We met around 1:30 p.m.

 3   Q      Did you become aware of a burglary that occurred at

 4   36712 Covington Road in Dade City, Florida?

 5   A      Yes, I did.

 6   Q      And did you speak to the investigating officers that

 7   investigated that burglary?

 8   A      I did.

 9   Q      And did you review the reports and have access to the

10   reports?

11   A      I did.

12   Q      Now, was that the burglary from which the guns you

13   purchased came?

14   A      That's correct.

15   Q      And was that burglary even discovered at the time you

16   were talking to Mr. Blanco about these guns?

17   A      No, it was not.

18   Q      The individuals in that house had what?  Left the home

19   and weren't back yet?

20   A      I believe.

21   Q      Now, when Mr. -- was there anything besides guns stolen

22   from that house?

23   A      There were other items.  I believe jewelry, the

24   weapons.

25   Q      All right.  When Mr. Blanco was arrested, did you find
```

```
 1   jewelry that matched what was taken from that burglary in

 2   his vehicle?

 3   A    Yes.  When Mr. Blanco was arrested at his probation

 4   officer's office, I searched incident to arrest and found in

 5   his Avalanche jewelry stolen from the residence inside his

 6   vehicle.

 7   Q    All right.  And did -- was a search later conducted

 8   of -- of Mr. Blanco's home?

 9   A    Yeah, I believe later a search was conducted with

10   consent from his wife, and one of the weapons that was

11   stolen with some jewelry was found in his backyard.

12   Q    Some additional quantity of the jewelry was found?

13   A    With a Luger pistol.

14   Q    Okay.  So, what we have is Mr. Blanco calling you to

15   sell weapons -- speaking to you to sell weapons from a

16   burglary before the burglary is even discovered by the

17   homeowners; right?

18   A    That's correct.

19   Q    And one of the guns that was not sold to you was found

20   buried in his back yard?

21   A    That's correct.

22   Q    Along with jewelry from that burglary?

23   A    That's correct.

24   Q    And jewelry from the burglary was also found in his

25   car?
```

```
 1   A    That's correct.

 2   Q    And did you debrief Mr. Alexander regarding what had

 3   happened?

 4   A    Yes, I did.

 5   Q    And did Mr. Alexander admit to you whether he

 6   participated in this burglary?

 7   A    He did.

 8   Q    And did he tell you whether anyone else participated

 9   with him?

10   A    Yes.  He said actually he assisted Mr. Blanco in the

11   burglary of the residence.

12        MR. FURR:  That's all I have, Judge.

13        THE COURT:  Mr. Ferlita, do you have any

14   questions?

15        MR. FERLITA:  Yes, sir.

16        THE COURT:  Mr. Ferlita, if it's more comfortable

17   for you to examine him from your seat, you may do that.

18   It's up to you.

19        MR. FERLITA:  No.  I'm fine, Judge.  Thank you.

20                    CROSS-EXAMINATION

21   BY MR. FERLITA:

22   Q    Mr. Estaban --

23   A    Yes, sir.

24   Q    -- you said that you spoke to Mr. Alexander on the

25   20 -- I mean Mr. Blanco on the 26th?
```

```
 1   A    The First time I time spoke to him --

 2   Q    Right.

 3   A    -- would be a telephone call on May 23rd, 2010.

 4   Q    Was that the first call, or did the first call come

 5   from Ray Alexander?

 6   A    It came from Ray Alexander, but then he put Mr. Blanco

 7   on the phone and I spoke to him briefly.

 8   Q    That was at 1:30 in the afternoon or at 7:00 in the

 9   evening?

10   A    No.  1:30 in the afternoon was the deal.  On

11   May 26th -- May 23rd was around 6:05 p.m.

12   Q    And your conversations with Ray Alexander, were those

13   in English or in Spanish?

14   A    Mostly Spanish.

15   Q    (Gestures.)

16   A    Mostly Spanish.

17   Q    Is he fluent in Spanish?

18   A    Pretty much, yes (nodding head).

19   Q    Pardon?

20   A    I would say so.

21   Q    All right.  In your conversations later in the evening,

22   you -- had you talked to Mr. Blanco prior to that time?

23   A    Prior to May 23rd?

24   Q    Right.

25   A    Never.
```

```
 1    Q     Who was it that -- was he introduced in some fashion or
 2  did Mr. Alexander tell you who it was?
 3    A     He said he was a friend.
 4    Q     Pardon?
 5    A     He said he was a friend.
 6    Q     Okay.  So, Ray Alexander tells you, "This is a friend
 7  of mine" and he puts him on the phone with you?
 8    A     That's correct.
 9    Q     And you say that the -- the guns that you ended up
10  buying came from this burglary?
11    A     (Nods head.)
12    Q     Do you know when the burglary occurred?  I know you
13  said it wasn't discovered until later, but do you know when
14  it occurred?
15    A     I would find out later it happened on May 23rd an hour
16  and a half prior to them calling me.
17    Q     The burglary occurred on May 23rd?
18    A     That's correct.
19    Q     At what time?
20    A     According to Ray Alexander, he would tell me it would
21  happen an hour and a half prior and then they would contact
22  me, figuring that I could purchase the weapons.
23    Q     Prior to that first phone call on the 23rd?
24    A     That's right (nodding head).
25    Q     And that information comes from Ray Alexander?
```

```
 1    A    That's correct.
 2    Q    All right.  You examined the -- the police reports on
 3    that burglary?
 4    A    I have (nodding head).
 5    Q    And is there any sort of evidence -- physical evidence
 6    that ties Mr. Blanco to the burglary?
 7    A    Yes.  The -- the jewelry and his car search incident to
 8    arrest was in his Avalanche and also jewelry and a Luger in
 9    his back yard.
10    Q    All right.  And Mr. Alexander, in fact, lived at that
11    same location, didn't he?
12    A    I'm not sure about that.  I'm not sure about that.
13    Q    You're not sure about that?
14    A    No.
15    Q    And Mr. Alexander also had access to that vehicle, did
16    he not?
17    A    I'm not sure about that either (shaking head).
18    Q    But there isn't any fingerprints of Mr. Blanco at the
19    burglary?
20    A    I don't believe so.
21    Q    And there isn't any DNA from the burglary that ties
22    Mr. Blanco to the burglary?
23    A    I don't believe so (shaking head).
24    Q    And you discovered how many guns were there that were
25    involved?
```

```
1   A      I purchased 16.

2   Q      Did any of those guns have Mr. Blanco's fingerprints on

3   'em?

4   A      No.  I didn't submit them for fingerprints as I

5   purchased directly from him.

6   Q      How 'bout the one that was dug out of the back of the

7   house?

8   A      I'm not sure if Pasco submitted that or not.

9   Q      Pardon?

10  A      I'm not sure if the Sheriff's Office submitted that

11  weapon or not.

12  Q      So, essentially the only information you've got that

13  Mr. Blanco was involved in the burglary came from Ray

14  Alexander?

15  A      Well, also that he has the -- the items in his vehicle.

16  He also has in his house --

17  Q      The back yard.

18  A      Pardon?

19  Q      Then you found some items in the back yard of the house

20  that Ray Alexander also stayed at, and you also found this

21  jewelry in the Avalanche that Ray Alexander also had access

22  to?

23  A      Right, and also conversations with Mr. Blanco with

24  reference to the weapons.

25  Q      Pardon?
```

```
 1   A    I'm sorry.  Is this better?  Also with Blanco calling
 2   me before the burglary was even reported in reference to
 3   these weapons on May 23rd.
 4   Q    I thought you told me that Ray Alexander is the one
 5   that called you?
 6   A    He called me; but then when I spoke to him soon after
 7   he called me in reference to these weapons, he had more
 8   understanding command of what was there than did Ray:  The
 9   type of weapons, what kind they were, the rifles, that --
10   the caliber of the rifles, types of shotguns.  He had a
11   strong command of the weapons where Ray did not.
12   Q    That phone conversation is recorded?
13   A    That's correct.
14   Q    And that's with Mr. Blanco?
15   A    That's with Mr. Blanco.
16   Q    And that conversation, you say, is an hour and a half
17   before the burglary?
18   A    Approximately.  I mean, I don't know the exact time of
19   the burglary; but according to Ray Alexander, it was soon
20   after the burglary had occurred they decided to call me
21   since he had dealt with me in the past with weapons.
22   Q    So, once again, that information comes from Ray
23   Alexander?
24   A    Information reference to what?
25   Q    That -- that he had those -- those -- you said somebody
```

```
 1   called you and gave you information about the types of guns
 2   and whatnot, and this was before the burglary even happened?
 3   A    Before the burglary was reported; correct.
 4   Q    Before it was reported?
 5   A    Correct.
 6   Q    And you're not certain as to when the burglary
 7   occurred?  Ray Alexander's given you some information on
 8   when it occurred?
 9   A    Correct, because the occupants weren't there, and I
10   wasn't there, so I don't know the time it happened.
11          MR. FERLITA:  I don't have anything further.
12          THE COURT:  Any redirect, Mr. Furr?
13          MR. FURR:  No, sir.  Thank you.
14          THE COURT:  Agent, as I understand it, you had a
15   conversation when Mr. Alexander called you, and then he puts
16   Mr. Blanco on the phone and you had a conversation with
17   Mr. Blanco?
18          THE WITNESS:  That's correct.
19          THE COURT:  This is on May 23rd?
20          THE WITNESS:  Yes, sir.
21          THE COURT:  And exactly what did he tell you with
22   regards to these -- what he was going to sell you?
23          THE WITNESS:  Blanco told me that the price is
24   very nice.
25          THE COURT:  I'm sorry.  Did --
```

```
 1              THE WITNESS:  Blanco told me that the prices were
 2   very nice, referring to the weapons.  He continued that the
 3   guns are in boxes.  He also said the guns were large and
 4   small.  He described them as .44, .357, .30-06, different
 5   calibers of the weapons.  He asked me if I can move the
 6   weapons sooner than later.
 7              THE COURT:  Did he indicate in any way whatsoever
 8   the source of those weapons?
 9              THE WITNESS:  He also listed a price, 5,000.  He
10   also stated -- I'm sorry -- that the weapons were hot,
11   meaning stolen.
12              THE COURT:  All right.  And then later on you did
13   you determine that the weapons that you purchased from him
14   and Mr. Alexander, in fact, were traceable to this
15   burglary --
16              THE WITNESS:  Correct.
17              THE COURT:  -- As well as other property found in
18   his car and at his residence?
19              THE WITNESS:  Yes, Your Honor.
20              THE COURT:  All right.  Thank you, Agent.  You may
21   step down, sir.
22              You have any other witnesses?
23              MR. FURR:  No, sir.  Thank you.
24              THE COURT:  Mr. Ferlita, you care to put on any
25   evidence or testimony?
```

```
 1              MR. FERLITA:  Yes, Judge.  Can I have one second?
 2              THE COURT:  Sure.  Go ahead.
 3              (Pause.)
 4              MR. FERLITA:  Judge, Mr. Blanco wishes to testify.
 5              THE COURT:  Mr. Blanco, you understand --
 6              THE DEFENDANT:  Yes.
 7              THE COURT:  Hold on a minute.  You have pending
 8  charges in Pasco County.
 9              THE DEFENDANT:  Yes, my attorney told me.  I tell
10  the truth about everything.
11              THE COURT:  All right.  So, are you going --
12              THE DEFENDANT:  I want to tell the truth,
13  Your Honor.
14              THE COURT:  You're going to be subject to
15  cross-examination by Mr. Furr.  Do you understand that?
16              THE DEFENDANT:  That's okay.  I will tell the
17  truth.
18              THE COURT:  Come on up and be sworn by the clerk.
19              (The Defendant was duly sworn or affirmed and
20  responded as follows:)
21              THE DEFENDANT:  Yes, ma'am, I do.
22              THE CLERK:  Thank you.
23              THE DEFENDANT:  (Seated.)
24                        NESTOR BLANCO, JR.,
25  the witness, being sworn or affirmed, testified as follows:
```

```
 1                        DIRECT EXAMINATION

 2              THE COURT:  Go ahead, Mr. Ferlita.

 3  BY MR. FERLITA:

 4  Q    Would you state your name, please.

 5              THE COURT:  Hold it.  Before we go any further, I

 6  want you to understand this also.  I'm sure Mr. Ferlita has

 7  explained it to you, but I want to make sure you understand

 8  it.

 9              THE DEFENDANT:  Yes, sir.

10              THE COURT:  I have not fixed the sentencing

11  guidelines yet.

12              THE DEFENDANT:  Yes, sir.

13              THE COURT:  Do you understand that?

14              THE DEFENDANT:  Yes, sir, Your Honor.

15              THE COURT:  If you get on this stand and I'm

16  convinced -- and I'm not saying I'm going to prejudge you --

17              THE DEFENDANT:  Yes.

18              THE COURT:  -- but that you haven't told the

19  truth, you could lose the three points you've been given for

20  acceptance of responsibility; and, additionally, you could

21  be assessed additional points upwards for obstruction.  Do

22  you understand that?

23              THE DEFENDANT:  Yes, sir.

24              THE COURT:  I'm going to listen to your testimony

25  just like I did to the agents.  I'm going to observe your
```

```
 1   demeanor, listen to the way you answer the questions, the

 2   same thing I tell the jury to do when I'm assessing

 3   credibility of witness, but you're aware of the risk that

 4   you're taking here?

 5            THE DEFENDANT:  Yes, sir, but I want to tell the

 6   truth.  I'm not worried about nothing, because I'm telling

 7   the truth.

 8            THE COURT:  All right.  Go ahead, Mr. Ferlita.

 9   BY MR. FERLITA:

10   Q    State your name.

11   A    Yes.  Nestor, N-E-S-T-O-R, Blanco, Jr.

12   Q    Do you know Ray Alexander?

13   A    Yes, sir.

14   Q    Did you ever act as an interpreter for Mr. Alexander?

15   A    Yes.  Ray -- Ray -- as the Agent said, he speaks a

16   little Spanish, but not fluently, all right, not like I can

17   or like my family can.  He always calls me or my wife to

18   talk, you know, fluently to someone like, you know -- like

19   when he's doing a treetop, because that's what he would do

20   on landscaping and stuff like that and it be Mexicans and

21   stuff like that.  I would have to translate for him, if I

22   could, if I wasn't working and I had time to do it.

23   Q    And did you ever translate for him in reference to some

24   firearms?

25   A    Yes, I did.
```

```
 1   Q      Can you tell His Honor --
 2   A      On the 23rd, we were coming from St. Joseph's Hospital
 3   in Tampa, and myself and Joanne and Betty were in my wife's
 4   car.  When we turned on 301 down Magnolia Avenue where I
 5   live -- on Magnolia there's Price Park, a park; and when we
 6   stopped there, Joanne, she -- she -- she signaled to me.  I
 7   was laying down.  I was so tired.  I had been up day and
 8   night for days with my wife at the hospital.
 9         And she says, "Look at Ray," And I got up.  When I got
10   up, Ray was flagging us down at Price Park.  So, she pulled
11   right beside of Ray; and he has a little black truck, an S10
12   Chevrolet truck, and he had the -- the kennel -- the little
13   pit bull -- a little pit-bull dog in the back in the case.
14         A case was sticking out, you know, like some kind of
15   violin case or something.  I didn't know what it was until,
16   you know, Ray started talking to us.  And I stepped out, and
17   then -- then I went around to his truck right there on the
18   passenger side.  We were parked on the side of his truck
19   like that.
20         And he said, "Look what I have."
21         When I looked there in the front seat, I seen massive
22   guns, rifles, you know; and I said, "Whoa.  I'm on parole."
23   So, I got -- "I'm not going to touch one of these firearms."
24         At that moment, I'm looking at the firearms, and he
25   shows me this bag -- shows me this bag with what looked to
```

1 | be cosmetic jewelry; and I said, "What's that?"  I said,
2 | "That looks fake."
3 |     So, he got an attitude with me.  He said, "No, my stuff
4 | ain't fake.  All my stuff is real."  He tells me like that.
5 |     You know, I said, "Man, you crazy."  I don't pay
6 | attention too much to Ray because Ray lies so much.  You
7 | know, we be catching him in so many lies.  So, you know, I
8 | kind of kept him at a distance ever since he molested my
9 | granddaughter with -- you know, we've been having that kind
10 | of like friction ever since then, you know.
11 |     So, I've been kind of like -- I do and I don't, because
12 | I was scared of him because he was with this gang, the
13 | La Familia gang, and his cousins.  He always put that little
14 | threat that he would -- if he don't have his way, he'll blow
15 | up your house or blow up your truck or your car or whatever.
16 |     So, I know he was -- you know, he was good at doing
17 | things like that.  So, I had to be careful of him.  I didn't
18 | trust him, you know.  I was kind of trying to work with him
19 | at the same time, too, you know.
20 | Q   So, what happened at that point after you saw these
21 | firearms?
22 | A   He said he wanted to call his gun collector and he
23 | needed me to translate for him.  I said -- I was looking at
24 | the little pit bull that he had back there, because he was
25 | injured, And I was concerned about the -- the dog, because

1    we have dogs, too.  And so, I told him, I said, "Sure, I

2    will translate whatever you want me to translate," and he

3    called somebody on the cellphone, and then he -- and he

4    passes me the phone.

5        I don't know who the -- who's on the phone, you know.

6    I don't know who's on the phone.  I can remember some things

7    like -- he says, "Just tell him," you know, "what I have"

8    and stuff like this in Spanish.

9        So, I started talking to him in Spanish, and the guy

10   started asking me about how many firearms.  I don't know

11   nothing about these firearm, you know, so I told him -- I

12   said, "Wait a minute.  Wait a minute."

13       I passed the phone back to Ray.  I said, "Ray, he's

14   asking me what kind of firearms."  So, I guess him and Ray

15   talked.  I don't know.  You know what I'm saying?  Because

16   Ray said "yes" and "no."  That's all he says.  He don't talk

17   that much Spanish.  He understands a lot, you know, but he

18   doesn't really speak it good like me, you know.

19       So, he said -- I guess he told him he'll call him back

20   or whatever, because he tells -- he tells me, "Don't go no

21   where.  Don't go no where, because I got to count the guns

22   and stuff like that."

23       So, he was doing his thing in his truck, you know.  He

24   had the radio on and everything, and I was with the dog, and

25   the -- the bed -- he's sitting right there in the car, and

```
 1   he was looking, you know, and I was looking at her.  I was
 2   doing like this:  "This guy here, he's trouble," you know.
 3   "We got to go," you know.
 4        And so, after a while -- after a while, he got
 5   everything straight and everything.  He must have called
 6   this man back there -- well, at that point I only knew he
 7   was a gun collector, you know.  That's all he would say, you
 8   know, because I questioned him.
 9        I said, "Ray, you already off probation?"
10        He said, "I'm already off probation.  I got my gun
11   rights and everything."  That's what he had told me, you
12   know.
13        So, I -- I said, "Okay," you know.  He always tells us
14   things like how we listen "yes" or "no" and this and that,
15   because we couldn't trust him, you know.
16        So, I said, "What's that case?"  He had a case sticking
17   out.  Looked like a violin or something like this.
18        He said, "Oh, no.  That's a hunting gun."
19        I said, "That thing is going to fall off the truck,
20   man.  You better put that in" -- you know, "more into the
21   truck" because it was sticking so much out of this truck.
22        And so, he -- he called -- he calls the man back, and
23   he -- and he said -- explained to him.
24        So, when he -- I answered the phone, the man tells
25   me -- he says, "How many guns are there?"  Right?
```

```
 1        And I told him how many there were, more or less, and
 2   what kind there were from seeing them, because he had them
 3   open.  I could see them on the seat.  I see a .357, and I
 4   see a -- I think a .44 and some rifles and shotguns.  You
 5   know, I just told him what I saw, you know, and I didn't
 6   know nothing about their setting up, when or where or
 7   nothing like that.
 8        I didn't know that Ray was doing this -- this
 9   situation.  For five or six months he's been doing this.
10   He's been lying to me, my wife, and all my family.  They can
11   tell you.  You know what I'm saying?  All of this time he's
12   been lying to us.
13        I said, "Wow, man."
14        So, I told this gentleman everything, and he said,
15   "Thank you very much," and he said, "Hand the phone back to
16   Ray."
17        So, I hand the phone back to Ray.  I never talked to
18   that gentleman ever again until the 26th.
19   Q    On the 26th, what happened?
20   A    That was a Wednesday.  That was a Wednesday.  That was
21   a Wednesday, the --
22   Q    What happened on the 26th?  How did you come back in
23   contact with him?
24   A    Nobody -- I was in St. Joseph's Hospital the whole time
25   with my wife and my family and everything; and while I was
```

```
 1   there -- my wife's brother is my boss, Dade City Glass
 2   Company in Dade City, Florida; and I am the foreman.  He
 3   called me and he said, "Blanco, I need you to come in
 4   Wednesday morning to do at least four or five orders of
 5   glass, you know, and a windshield -- and a windshield on a
 6   car."
 7        I said, "Sure, George, I will come in," you know.  "I
 8   will leave early."
 9        So, I left early Wednesday morning, and nobody knew I
10   was in Dade City, not even Ray or nobody.  But Ray must have
11   passed by that morning and saw my Avalanche at the company,
12   but you've got to keep in mind Ray cannot come on that
13   property.  He has a no-trespass by my boss because Ray is
14   always -- he's always doing somebody wrong.
15        We've been trying to help him since 2008.  We've been
16   trying to help that young man; but when he did that with my
17   granddaughter, I really started losing faith, but I was
18   trying to --
19   Q    Was he living in and out of your house?
20   A    He was living in my house when that thing happened with
21   my granddaughter, and he never did live there no more, but
22   he lied.  He lied to the detectives and everything in
23   Dade City, saying that I did a burglary with him and he was
24   living in my house, he was sleeping on my couch.  We don't
25   even have a couch.  That was in -- that was on the -- I
```

1  believe the 23rd when that burglary occurred.

2  Q    All right.

3  A    He told them that, and he lied on me, and then I -- I

4  found out later he changed it.  He changed his testimony

5  when he found out that the detectives lied to him, said,

6  "Listen, Blanco was already telling everything on you, so

7  you might as well tell us the truth."

8  Q    Back to the 26th -- how did you come in contact with

9  this gentleman on the 26th?

10 A    About -- oh, well, I was at work, and Ray came by there

11 about 10, 10:30 a.m.  I just finished speaking to my wife at

12 St. Joseph's, and I told her -- she wanted to know how long

13 I will be.

14      I said, "Hopefully two, three hours I will be gone.

15 I'll go straight to the hospital."

16      And Ray -- Ray came around there about 10:30.  Ray

17 said -- he said -- he said -- he called me on the cellphone;

18 right.  And I seen it was Ray, and I said, "Hello."

19      He says "Look up."

20      When I looked up, I seen his truck parked right outside

21 the fence, because he can't be on our property because of a

22 no-trespass at Dade City Glass Company.

23      So, I -- he said, "Come to the fence.  Let me talk to

24 you."

25      I went to the fence, and he told me, "Listen, I had

1   this dresser I need to deliver to Wesley Chapel."

2        I said, "Yeah."

3        He said, "And it's an old Spanish lady, and I need you

4   to come with me so you can translate for me."  Just like

5   that he told me.

6        I said, "I don't know, Ray.  I got to leave for the

7   hospital when I leave here, man.  Nurry called me.  She

8   called me."

9        He said, "No.  It's right off of 54.  It's only four or

10  five blocks, the apartment that I have to go to."

11       I said, "Okay.  If that be the case, let's see what

12  time I get off," you know.

13       He said, "What time you getting off?"

14       I said, "I don't know.  Maybe -- maybe -- I'm shooting

15  for lunchtime.  Lunchtime, 1:00."

16       So, I finally left -- I left -- I told -- he told me

17  that he would be at Flying J -- Flying J is right off I-75

18  on 52 -- with the truck -- with his truck.  So, I told

19  him -- I said, "Okay, I'll call you when I get off."

20            Around 1:00 -- 1:00, I left my house.  I left the

21  job, and I went to my house.  I live only four or five

22  blocks from my job.  I went to my house.  Everything was

23  straight, and I left.  But I forgot about Ray, you know.  I

24  wasn't even thinking about Ray.

25            I was going down 52, and then all of a sudden I

1    see Ray pull out with his truck out of the Flying J.  I

2    said.  "Oh, there goes Ray.  My God, I got to help him with

3    the dresser, deliver the dresser."

4           So, I followed him.  He got off 54.  When he get

5    off 54, he pulls up to this apartment.  He looks like he's

6    been there before, because he backed up to the apartment --

7    to the apartment and everything.  He told me, "Just park

8    your truck over there."

9           So, I parked my truck there, and next thing I know

10   I'm helping him get this big, huge, dresser.  It was very

11   heavy, old-fashioned, because in -- in Dade City, we deal

12   with antiques -- antique furniture.

13          So, I thought he was just selling this dresser or

14   something to these people -- these Spanish people.  So, I

15   get there.  I -- I'm taking it out, and -- with a dolly -- I

16   move it -- because it's so big, and I turn around.  I look

17   at two doors and him, and I said, "Ray, which door?"

18          He said, "The right door.  The door on the right

19   side."

20          So, I started knocking; boom, boom, boom, boom.

21   Right.  I'm knocking, and I said, "Ray, ain't nobody

22   answer."

23          He said, "Oh, just a minute."

24          He turns around and walks away from me.  I kind of

25   think that's kind of strange, being in his pocket walking

```
 1   away from me with his cellphone, walking away like 30 or
 2   40 feet away.  He seems like he was calling somebody or
 3   texting or doing something.
 4        And so, I look at him, and I'm kind of like,
 5   "What's up with this?"  I done told Ray that I got to get to
 6   the hospital and nobody is here.  I was fixing to leave.
 7        When Ray turned around, Ray says, "Listen, I just
 8   talked to her son.  He said he will be here in the area.
 9   He'll be here in one minute."
10        I said, "Okay."  I said, "All right."
11        So, I turned around, and he said he's going to the
12   game box; and he's opening the game box, like grabbing some
13   tools.  He said, "Man, I got a new invention.  Wait till you
14   see what I got."  And I'm like, "What's he talking about,
15   'new invention'?"  He's always trying to impress me --
16   because he looked at me like a father and my wife as a
17   mother -- what he didn't have, you know.
18        So, I said, "Okay."
19        The next thing I know, here comes a black truck --
20   a black truck pulls up, and it's that gentleman right there.
21   He jumped out of the truck, but he had a coat on.  He had a
22   big coat on, and it was hot, and he had a jacket or coat on,
23   and I was wondering, "Man, what this guy doing with a
24   jacket?"  I didn't know why.
25        So, he says, "How you doing?"  He kind of shook my
```

1  hand, but he kind of in a hurry going to the door, going to

2  the door.

3          So, he's going to the door, and I'm right behind

4  him.  He puts the key in, and I -- he opened the door.  He

5  opened the door, and I go in with the dresser, and I said,

6  "Sir, where do you want the dresser at?"

7          He says, "Leave it right there in the middle of

8  the living room."

9          I said, "Okay," you know.  That was strange, and

10 it was super hot.  It was so, so hot in there, I was

11 sweating and everything.

12         And then Ray comes in and he says, "Oh, no, no.

13 I'm fixing to put it right side up like it's supposed to."

14         Ray and him -- it's like both of them knew.  They

15 said, "No, no.  Put it front side down."

16         When I put the front side down and the back up,

17 Ray starts opening, and I'm kind of looking like this.  I'm

18 looking like this.  He had a videotape on me or something.

19 He could see in the videotape, looking.

20         And I'm looking, and I said, "Whoa, man.  What's

21 going on here?" you know.

22         When I see -- he's opened this, I see what's going

23 on then, you know.  That's when I'm thinking when he said

24 that -- when he was getting his tools, he was telling me

25 about this gentleman here, the gun collector, that the son

```
 1   is the gun collector.
 2           I said, "Oh-oh."  I started putting two and two
 3   together.
 4           At this point, he said, "Blanco, I want you to
 5   translate for me.  That's all."
 6           So, that's what I did.  I spoke to the gentleman.
 7   He was asking me questions in Spanish and everything.  I was
 8   telling him everything.  Anything he wanted to know, I would
 9   tell him, you know.
10           He said, "This makes him happy because he's my gun
11   collector.  He's a good buyer."  So, that's what I did, you
12   know.
13   Q    How long were you there?
14   A    I was -- I wanted to get up out of there because I'm on
15   parole, and I seen it was going very slow, and I'm agitated.
16   I was fearing this, what was going on.  I didn't want to be
17   there, and I -- this gentleman here was questioning
18   everything.  He was asking Ray, but I didn't pass him never
19   a firearm.  Ray was passing him the firearms.  Okay.
20       I did not pass that gentleman there the firearm, you
21   know, that I can recall.  I don't believe I did.  But the
22   thing is, I seen him going kind of slow, and then he
23   mentioned something about his uncle -- his uncle being there
24   in five minutes, and I was thinking about, you know, I don't
25   do no crimes or nothing like that no more for years.  It's
```

1    been like 30 years.  I haven't participated in nothing, and

2    he -- and he -- when he said that, I'm thinking, "Here I am.

3    I believe this is a gun deal going down.  I don't have no

4    firearm.  I don't have nothing.  This guy got a coat on, a

5    jacket on."  I was sure that he was packing a gun or

6    something and thousands of dollars.

7         They started talking about thousands of dollars.  I was

8    really tripping.  I was freaked out.  I was freaked out, so

9    I thought it was time for me to hurry and get something.

10   So, I didn't want to touch the guns, but the -- I think they

11   had Ziplocs or something -- cases on these guns that were

12   Ziploc'ed or something, the last ones, and I just kind of

13   like grabbed the cases and give it to Ray.

14        I said, "Ray, let me get this dresser out of here and

15   put it back on your truck."

16        I was hot.  I was upset.  I was ready to go, you know,

17   so I was doing this, but I didn't understand why he was

18   trying to like hold me down.  I could feel the gun collector

19   was trying to keep me there longer, you know.  I don't know

20   why I felt that, you know.

21        So -- so, as I was pulling to go around, Ray turned

22   around and he tells me, "Here, put this in your pocket."

23        He passes me like a roll of money, and I put it in my

24   pocket, and I'd said, "Uh, okay."  I remember that Ray told

25   me he was going to give me some money on the truck.

```
 1        When I was getting outside, Ray come behind me, and Ray
 2   says, "Okay, we're seven."  He told me we're -- we at seven.
 3        I said, "No, I don't think we are at seven."  What it
 4   was, he was talking about my Avalanche.  He was buying my
 5   Avalanche at seven.  He gave me a thousand-dollar deposit,
 6   and he said he was going to give me two thousand that week.
 7        Well, right then I didn't know he had put 2,000 in my
 8   hand.  I didn't know yet, but he had give me $2,000 on the
 9   truck; and when he said, "Seven.  Now we're at seven," I
10   said, "I don't think so.  Are you coming to the hospital
11   tonight to see Nurry?"
12        He said, "Yes."
13        I said, "We got to talk."  That's what I told him.
14        And when I told him that, he -- he said, "Okay, we'll
15   talk.  We'll talk.  I'll be there."
16        I said, "You sure you going to be there?"
17        He said, "Yeah, I'll be to the hospital tonight."
18        So, I helped him put the dresser in there, and the
19   gentleman there wanted us to come back inside, you know.
20        I don't drink, sir.  I don't drink, Your Honor.  When I
21   walked in there and he offered me a beer, I can't believe I
22   drank a beer.  I drank that thing down quick.  I was so hot
23   and thirsty, you know, and I never drank a beer in my life.
24   I don't even drink beer.
25        I was -- I was just -- the state of mind I was in, you
```

1    know, I was scared.  You know, I was tripping.  My wife,

2    what I was going through -- I been in the hospital that day.

3    That was Wednesday.  I was there Friday, Saturday, Sunday,

4    Monday, Tuesday, Wednesday.  That was the sixth day, and I

5    was there all night -- day and night with her.  She had four

6    surgeries back to back on that whole time; and what I was

7    going through and everything, I just wanted to get out of

8    there.

9         And he wanted to talk some more, ask questions.  Ray

10   had told me, "Make sure you tell him I got some AK-47s."

11        I said, "What?" you know.  So, I stuck that in there

12   for him in the translation.

13        And after I told him that, what else I told him?  I

14   told him a little bit about my life, let me impress this guy

15   a little bit.

16        I don't know if Ray -- Ray was set up with him to do

17   something against me or there was Ray's gang like

18   La Familia, because he got the tattoo in the back from the

19   gang from Dade City.  I didn't know if they was together.  I

20   didn't know what was going on.  So, the only thing I knew

21   was that I wanted to get out of there.

22            So, he asked me about some jewelry and diamond

23   stuff; and, you know, I said, you know, "I don't know."  I

24   just play along.  I didn't know.  I just wanted to get out

25   of there.

```
 1              So, when I get up out of there, I told him, "I
 2   need to get to the hospital."  I told the agent, "I need to
 3   get to the hospital."  We left.
 4   Q    So, you went to the hospital?
 5   A    Yes, sir.  I went to -- Ray -- Ray took off in this
 6   direction.  I took off in this direction.  When we got
 7   there, he left to Dade City, and I got back on the freeway,
 8   and I went straight to St. Joseph's Hospital.
 9   Q    That was your contact with him on the 26th?
10   A    That was the only contact right there.  I never seen
11   that gentleman before in my life, only that day.  And at the
12   hospital, Ray did come.  Ray came about 8:15 p.m.  He came
13   about 8:15 p.m. in the hospital, and he -- Joanne was there.
14   My wife was there.  I already talked to my wife and Joanne
15   about what happened, me and Joanne and everything, and we
16   decided to give Ray the money back, you know, when we get
17   there.
18          And I really didn't want to, you know, start something
19   there in the hospital because my -- the condition that my
20   wife was in and everything, but I said, "When my wife gets
21   back home and everything, we're going to sit down with Ray
22   and we're going to talk about what's going on with Ray," you
23   know, "because something is happening," you know, "because I
24   didn't seen -- "after what I seen, what he did with the
25   gentleman sitting down right there."
```

1      So, I gave him the 2,000.

2      He said, "Oh, you're not going to sell me the truck?"

3      I said, "No, I'm not saying that; but, Ray, those guns,

4  they were hot.  I don't know where you got the guns from.  I

5  don't want to know."  I told him, "I don't want to know."

6      And then he said, "You're not going to sell the truck?"

7      I said, "Yeah, we're going to talk about that.  Wait

8  till Nurry gets home.  When she gets home, we're going to

9  sit down and talk about it."

10      And that's what -- he stayed there and slept the night

11  and left in the morning.  I never seen Ray no more until --

12  until I picked my wife up Friday.

13      When I picked her up Friday from the hospital, you

14  know, I brought her home.  Ray -- Ray came by -- no.  I

15  called him and I said, "Mom is home; right."

16      He said, "Okay," and then he said he would be by there

17  later on that night, and he never came.

18      Next thing we know he was arrested.  He got in trouble

19  or something, and next thing I know -- or the first time my

20  parole officer calls me and tells me -- and I been on parole

21  since August 2002, Your Honor, doing nothing but the

22  straight thing.

23      I'm a preacher.  I'm an ordained minister, preaching,

24  teaching the word of God at church, doing the right thing.

25  No drugs, no drinking, nothing.  And my parole officer for

```
 1   the first time in all those years, he called me saying,
 2   "Blanco, I need you to come in at 8:30."
 3        I said, "Is something wrong?"
 4        He said, "Oh, no.  Just come in at 8:30."
 5        I said, "Okay.  I'll be there."
 6        It was like -- Monday was Labor Day.  I think it was
 7   June the 12th.  When I went there, I came in; and
 8   Mr. Brett -- I said "good morning" and everything.
 9        When I went to sit down, three detectives -- Dade City
10   detectives, they grabbed me, put me against the wall, and
11   they handcuffed me and said, "You're under arrest."  First
12   thing they said, "You got a gun?"
13        I said, "What?  A gun?  Are you kidding?  I'm on
14   parole.  I don't need no gun."
15        And then that -- that tipped me off when he told me
16   that, and that's when they -- they said, "You going to talk
17   to us when we get to the" -- "to the" what they call it --
18   "the station?"  They got a little substation there.
19        So, when I got there, that's when they told me about,
20   "Listen, something's going down about Ray about a dresser."
21        I said, "Oh-oh."  I knew that's what it was.  I said,
22   "Well, I know that Ray had a dresser, but I want" -- "I want
23   to see my attorney."  That's what I told him right then at
24   that point.  "I want to see my attorney."
25   Q    Okay.
```

```
 1  A    That was the scope of that right there, exactly what
 2  happened with Ray.
 3  Q    Okay, Mr. Blanco.  Thank you.
 4          THE COURT:  Mr. Furr.
 5          MR. FURR:  Thank you, Judge.
 6                    CROSS-EXAMINATION
 7  BY MR. FURR:
 8  Q    Sir, this burglary occurred at 36912 Covington Road,
 9  Dade City.  You've been to that residence before, haven't
10  ya'?
11  A    Yes.  I found out that that was my veteran's [sic]
12  house that Ray and whoever -- I think his cousin Adam.
13  Q    Dr. Taylor's house; right?
14  A    Yes, sir.
15  Q    And you were there working, doing a job for Dade City
16  Glass Company not too long before this burglary?
17  A    I'd say about six months.  About six months, something
18  like that.
19  Q    So, you know that they have identified you as being at
20  that residence?
21  A    We're like family.  Dr. Taylor and his wife, we're like
22  family.
23  Q    You think you're still like family?
24  A    Yes.
25  Q    Oh, yeah?
```

1    A    I love them.  Dr. Taylor saved our dog.  Our baby was

2    Pina Blanco, our little pit bull we had.

3    Q    I understand your wife was ill and that instead of

4    going to the hospital to see her, you decided to turn around

5    and go back and help Ray Alexander deliver a dresser?

6    A    No, sir.

7    Q    Isn't that what you just told us?

8    A    No.  I left Dade City, my job.  I was going to the

9    hospital.  Because Ray told me it was on the way to the

10   hospital off of Wesley Chapel, about four or five blocks

11   only.  If he would have said four or five miles, I would

12   never have went.

13   Q    It's the same guy that you said you had seen on the

14   side of the road and you had stopped your car to see him,

15   and that's when you saw the guns back a couple, three or

16   four days before?

17   A    On Sunday, about 6, around there, 6:15 or something.

18   Q    And you -- knowing Ray, you know those guns had to be

19   stolen; right?

20   A    Well, at that moment I didn't know until the

21   conversation with him, you know.

22   Q    Well, what -- what did Ray do for a living besides

23   steal?

24   A    Well, tell me about it, man.  That's sad.  He stole my

25   gold chain.

```
 1   Q    You knew he was a thief; right?

 2   A    Yeah, but we were trying to work with him.  We know he

 3   had -- go ahead.

 4   Q    This is the guy that you said molested your

 5   granddaughter.  So, you're driving along with your family,

 6   and you stop to help him out on the side of the road.  Then

 7   days later you help him haul a dresser to some apartment in

 8   Dade City or wherever, Wesley Chapel; right?

 9   A    What was that now about the side of the road?

10   Q    The guy that raped your granddaughter -- a guy rapes

11   your granddaughter, and you're telling me that you are with

12   your family and you stop to see if you can help him on the

13   side of the road, and then you see that he's got guns.  You

14   know he's a thief, and then three days later you're helping

15   him haul a big dresser upstairs so you can meet the

16   undercover agent; right?

17   A    I didn't know he was an undercover agent.  If I would

18   have known, I could have told him then --

19   Q    Wait a second.  Let's keep going here.

20   A    All right.

21   Q    When you were -- when you were talking before cross,

22   one time you said you had a jacket on; the other time you

23   said he had a jacket on.

24   A    No.

25   Q    And you were worried about him having a gun.  He didn't
```

```
 1  have a jacket on.  You want to think through it again?

 2  A    No.  He had a jacket on.  I didn't have a jacket.  I

 3  had a T-shirt on.

 4  Q    And after you guys pulled the guns out, he told you,

 5  "Those guns aren't staying here."

 6       And you said -- you did a fist pump with him and said,

 7  "Good" (indicating)?

 8  A    No, I didn't.  I didn't do no fist thing.

 9  Q    After you did -- after you did all this, you're telling

10  us how afraid you are for your life and you're a preacher

11  and a man of God and all that kind of stuff and haven't done

12  a crime in 30 years?

13  A    I didn't.

14  Q    You turn and say -- and he says, "Hey, let's have a

15  beer," and you sit down and have a beer; right?

16  A    No.  He said that when I first came in.  First thing he

17  did.

18  Q    You guys didn't even have the beer until after you had

19  already unloaded the guns?

20  A    No.  The first thing he did was give me a beer when I

21  walked in, first thing.  That was the first thing that came

22  out of his mouth.

23  Q    And the first thing that came out of your mouth was to

24  say, "I'm originally from Key West, and I got in a shootout

25  with the cops down in South Florida in Miami and did 22
```

```
 1  years in prison.  They shot me, but they can't kill me";
 2  right?
 3  A    No.  I don't think it was that -- in that kind of way,
 4  you know.  Nobody did shoot me in Miami, and I didn't shoot
 5  nobody in Miami.
 6  Q    And the way the -- the way the exchange of money went
 7  down was he started counting the money out; and when they
 8  got to the first 2,000, your partner, Mr. Alexander, took
 9  and handed you that money right in front of everybody;
10  right?
11  A    He turned around and said, "Here.  Put this in your
12  pocket" when I was going out the door with the dresser.  I
13  wasn't thinking about getting no money or nothing like this.
14  Q    This same fellow that you say molested your
15  granddaughter and was no longer allowed in your house
16  somehow decided your house would be the place to dig a hole
17  and bury one of the weapons from the burglary and some of
18  the jewelry; right?
19  A    Yes.  That's what he did.
20  Q    And put the rest of it in your car; right?
21  A    No.  It was actually his truck.  He was buying it.
22  Q    Well, it was your truck.  It was your truck.
23  A    Yeah, it was, but I wasn't going to -- I told him I was
24  not going to give him the title until he finished paying for
25  it.
```

```
 1   Q    Who drove that truck?  You did.

 2   A    Well, I drive the glass truck all the time.  That's why

 3   I was getting rid of the truck.  But I do drive it when I

 4   need to, because it is my truck, you know; but he was the

 5   one that -- that detailed the truck, washed the truck.  He

 6   was obsessed with the truck, and he knew I was going to get

 7   rid of it.  That's why he stepped [sic] to me.  I was trying

 8   to help him.

 9   Q    And the jewelry that you say was costume jewelry was

10   worth about $50,000; right?

11   A    Well, what I seen in that little bag that he showed me,

12   it looked -- it looked like custom -- you know -- whatever

13   they call it -- costume jewelry.

14   Q    Honestly, you told the Judge it looked like glass, but

15   you didn't think I would know it would cost $50,000, and you

16   would make it look like it wasn't that big of a deal; right?

17   A    It didn't look that big to me, to tell you the truth.

18   I didn't pay attention too much to Ray.

19   Q    And here you haven't committed crimes and you're a man

20   of God and everything; and when you met the agent here and

21   he's in his official capacity, you sat down -- you didn't

22   just ask for an attorney?  Let's put this on the table, too.

23   You were given Miranda and you sat down and talked to him?

24   A    To whom?  Who you talking about?

25   Q    You sat down and talked to the agent?
```

```
 1   A     No.  I was talking about -- no, I was talking about the

 2   detective in Dade City.  I wasn't talking about him.

 3   Q     You admitted you knew Alexander had been trafficking in

 4   stolen weapons; right?

 5   A     No, I didn't know that.  I didn't know that.

 6   Q     And you said that you -- you admitted you helped him

 7   load the suspiciously heavy dresser into the truck but

 8   didn't know the firearms were there; right?

 9   A     Right.  I didn't know that.  It's impossible.  He had

10   that thing sealed, tied up and everything.

11   Q     You said you were present when the special agent, the

12   undercover guy, arrived; right?

13   A     Yes.  I was waiting for him.

14   Q     All right.  But you denied knowing any guns were in the

15   dresser at all; right?

16   A     Right, until Ray told me that he -- that his son to

17   the -- to the elderly lady is his gun collector, you know.

18   But I said -- he still didn't tell me nothing until he

19   opened that up inside there.

20   Q     And you waited in the car and denied having anything to

21   do with this even after you were told it was videotaped?

22   A     Waited in the car?  No, I didn't.  I don't have a car.

23   I have a truck.  I have a truck.  I never -- I never waited

24   in the truck.  As soon as we got there, I jumped out the

25   truck, and I was -- I came to do what I wanted to do so I
```

```
 1   can leave, you know.  I almost left Ray there with the

 2   dresser.

 3            MR. FURR:  Judge, I don't have anything else.

 4            THE COURT:  You have any redirect, Mr. Ferlita?

 5            MR. FERLITA:  No, sir.

 6            THE COURT:  Thank you, Mr. Blanco.  You may step

 7   down.

 8            Do you have any other evidence or testimony,

 9   Mr. Ferlita?

10            MR. FERLITA:  No, sir.

11            THE COURT:  What says the Government, Mr. Furr?

12            MR. FURR:  Judge, I don't have any other evidence.

13   I would ask you to take the three points away for him in

14   assessing for obstruction.

15            THE COURT:  Mr. Ferlita, what do you say?

16            MR. FERLITA:  Just a second.

17            (Pause.)

18            THE COURT:  The Government wants me to take away

19   the three points for acceptance and add how many --

20            MR. FURR:  Judge, if it were up to me, I'd life

21   him.  I'm serious.  I'd life him.  This guy has tried to

22   kill police officers on two separate occasions.  He's

23   escaped twice here in Hillsborough County.

24            THE DEFENDANT:  Not then, Judge.

25            MR. FURR:  He's an absolute thug.
```

```
 1              THE COURT:  All right.  My question to you -- not
 2  you.
 3              Mr. Ferlita, they want me to take away three
 4  points for acceptance and add how many points for -- what?
 5  Two?
 6              PROBATION OFFICER:  Two points, Your Honor, for
 7  obstruction of justice.
 8              THE COURT:  What's your position?
 9              MR. FERLITA:  Judge, I don't know what the three
10  points for acceptance has to do with this issue as to
11  whether or not he's -- he committed this burglary.  I
12  thought --
13              THE COURT:  Is seems to me -- what he basically
14  told us here is that he did not commit these offenses, he's
15  not guilty, he's innocent, he was like the three proverbial
16  monkeys:  He saw no evil, heard no evil, spoke no evil.
17              And in contrast to that is the testimony of the
18  undercover agent and also, well, the case involving
19  Mr. Alexander where --
20              Was your phone conversation with him taped?
21              AGENT ESTABAN:  Yes, Your Honor.
22              THE COURT:  Do you have that with you?
23              AGENT ESTABAN:  No, Your Honor.
24              THE COURT:  Do you have a transcript?
25              AGENT ESTABAN:  It's pretty detailed in my report
```

```
 1   in reference to what was said.
 2          THE COURT:  And do you have a specific
 3   recollection that when you have that phone conversation with
 4   Mr. Blanco he told you that these weapons were hot?
 5          AGENT ESTABAN:  Yes.  In Spanish, caliente.
 6   Everything was in Spanish.
 7          THE DEFENDANT:  Whatever Ray told me, Your Honor,
 8   I told him -- Ray would tell me whatever he wanted to
 9   translate and I would translate it.  But if I knew those
10   guns were inside that dresser on the 26th, I wouldn't have
11   done nothing with Ray that day.  Believe that.  Nothing.
12          THE COURT:  You know, I listened to your
13   testimony, and it's incredible.
14          THE DEFENDANT:  Yeah, I know.  It's crucial.  I
15   was thinking about it, too.  I said, "Man, this thing looks
16   bad, because it's got me on the spot."
17          THE COURT:  It's an incredible story from an
18   incorrigible individual.  Your history -- Mr. Furr's right.
19   You're a thug.
20          THE DEFENDANT:  My family's there.  They can tell
21   you how we tried to help Ray.
22          THE COURT:  So, you tried to help a man who you
23   say molested your granddaughter?
24          THE DEFENDANT:  I forgive him, Your Honor.
25          THE COURT:  You think I just got off the ship from
```

```
 1   Sicily, Mr. Blanco?

 2           THE DEFENDANT:  We forgive him.  We been going to

 3   church.  We been trying to help.

 4           THE COURT:  I find he's -- his rendition of what

 5   took place here with regard to a crucial issue is

 6   incredible, and it -- and his whole testimony here reflects

 7   that he has not accepted responsibility in this case and

 8   he's not entitled to that reduction, and I also find that

 9   he's taken the stand and been completely untruthful and done

10   his best to obstruct justice in this case.  So, I'm

11   assessing him two levels upward adjustment for obstruction.

12           So, where does that leave us?

13           THE PROBATION OFFICER:  Your Honor, under Chapter

14   2 and Chapter 3, that enhances him two levels for

15   obstruction, and not giving him acceptance, he's at Offense

16   Level 36, which is higher than the armed career criminal

17   guideline.  So, it would be a Level 36, Criminal History

18   Category VI, and that's 324 to 405 months.

19           THE COURT:  I'm sorry, say again.

20           THE PROBATION OFFICER:  The Total Offense Level

21   would be 36.

22           THE COURT:  All right.

23           THE PROBATION OFFICER:  The Criminal History

24   Category would be VI, and it's 324 to 405 months.

25           THE COURT:  All right.  And he's still subject to
```

1   three to five years supervised release?  Restitution's not

2   an issue here, as I understand it.

3            MR. FURR:  Excuse me, that's my understanding.

4            THE COURT:  Okay.  All right.  The fine range is

5   what?

6            THE PROBATION OFFICER:  Twenty thousand.

7            THE COURT:  To 200,000.  There's a $100 mandatory

8   special assessment.

9            All right.  Having done that, Mr. Ferlita, I will

10  hear you with regard to the statutory factors.

11           MR. FERLITA:  Judge, did you end up with Level 36?

12           THE COURT:  Yeah, it's Level 36 --

13           MR. FERLITA:  Thirty-six; right?

14           THE COURT:  -- Criminal History Category VI.

15           MR. FERLITA:  All right.

16           THE COURT:  The advisory range is 324 to 405.

17           Mr. Ferlita, what says you to the statutory

18  factors?

19           MR. FERLITA:  Judge, insofar as mitigation is

20  concerned?

21           THE COURT:  Yes, sir.

22           MR. FERLITA:  Judge, Mr. Blanco is 55 years old.

23  His wife, who he totally supports and -- he's been working

24  at Dade City Glass for approximately six years, and he is

25  the sole support of the family.  In fact, since he's been in

```
 1    jail, the home that he and his wife were living in has been
 2    foreclosed.  I think she's now living with one of her
 3    children.
 4          We'd ask the Court to take those factors into
 5    consideration in imposing a sentence which would be
 6    reasonable for a 55-year-old.  Even if you gave him the
 7    15-year minimum mandatory, he still wouldn't be out of jail
 8    until he's approximately 70 years old.  I'd ask the Court to
 9    consider imposing that 15-year minimum mandatory.  And due
10    to his age and his wife's illnesses -- and I think he
11    suffers also from some medical problems -- in mitigation.
12          THE COURT:  Mr. Blanco, is there anything you care
13    to say in mitigation?
14          MR. FERLITA:  Pardon, Judge?
15          THE COURT:  Is there anything that Mr. Blanco
16    wishes to say in mitigation?
17          MR. FERLITA:  You want to say anything, ask him to
18    lessen your sentence?
19          THE DEFENDANT:  Your Honor, you know, I have done
20    about 31 or 32 years of my life --
21          THE COURT:  Let me ask you a question.  I'm
22    puzzled about something.  With regard to that incident down
23    in Dade County, you were originally sentenced to life.
24          THE DEFENDANT:  In Dade County?
25          THE COURT:  Yes, sir.  And then --
```

```
 1              THE DEFENDANT:  Well, what --

 2              THE COURT:  And then -- let me see.

 3              THE DEFENDANT:  The co-defendant had the weapon.

 4   He -- he went berserk and shot --

 5              THE COURT:  No.  You originally received life in

 6   1984.

 7              THE DEFENDANT:  Yes, sir.

 8              THE COURT:  Then you were resentenced to 30 years

 9   in prison, with each count consecutive.  Did the appellate

10   court order that?

11              THE DEFENDANT:  Yes, sir, because I didn't have a

12   firearm.  I didn't do no crime or nothing.  That's why.

13              THE COURT:  Then after being resentenced a month

14   later, you got 15 years in prison?

15              THE DEFENDANT:  No.  It's the same thing.  That

16   was the same thing.  They didn't know what to do, if they

17   wanted to go 15 and 15 years probation, and they changed it.

18   And then they -- they were just going round and round and

19   round about what to give me.

20              THE COURT:  And then eventually you got 20 years,

21   each count executive, in '94; and then you're paroled eight

22   years later?

23              THE DEFENDANT:  No.  I did 22, Your Honor.  I did

24   a straight 22 on that.  Twenty-two calendar years.

25              THE COURT:  Yeah, you did.
```

```
 1          THE DEFENDANT:  Yes, sir.  But they discovered
 2   that -- that I wasn't -- I wasn't the shooter and I didn't
 3   do no crime or nothing.  I was there, but this -- this is
 4   the situation here:  I was there, but I didn't do it, you
 5   know.  I just -- it happens to me.  I don't know why
 6   everything happens to me, you know.
 7          THE COURT:  Just like the armed robbery at the
 8   Wendy's Restaurant?
 9          THE DEFENDANT:  That there -- I never done drugs
10   in my life, and they're calling it metha-quaaludes or
11   something like that.  They call them "gorilla biscuits," and
12   I took those, and I just lost it.  They shot me three times.
13   That's what I was telling the agent:  They shot me right
14   here, right here, right here, and right here.  Three times.
15          THE COURT:  Did you shot one of them?
16          THE DEFENDANT:  No, sir.  I didn't shoot no one.
17   I don't even know what happened.  I don't know what a bullet
18   feels like.
19          THE COURT:  You went into the Wendy's Restaurant
20   and robbed the restaurant?
21          THE DEFENDANT:  That's what he said I did.  I
22   don't remember.  I was on cocaine, metha-quaaludes,
23   everything.  That's something I never done.  Only seven days
24   I did it, sir, and I never did drugs again.
25          THE COURT:  Then you escaped.
```

```
 1              THE DEFENDANT:  I walked out of the hospital, yes.

 2              THE COURT:  Twice?

 3              THE DEFENDANT:  Well, the second time, sir, I fell

 4    out of the van on I-75.

 5              MR. FURR:  (Laughs.)

 6              THE DEFENDANT:  I know it's funny.

 7              MR. FURR:  They found him the next day.

 8              THE DEFENDANT:  No, no.  The next hour.  How do

 9    they find me the next day?  I was laying on the freeway by

10    the Busch Boulevard exit, and I seen that in the paperwork

11    that they found me the next day.  How could they find me the

12    next day and I fell out of the van right there and civilians

13    saw me fell out of the van?  Because the officer opened the

14    side door because the air conditioner wasn't working.

15    That's the reason that he opened the door.

16              THE COURT:  Anybody else want to speak on his

17    behalf?

18              THE DEFENDANT:  Yes, Your Honor.  My wife would

19    like to say something.

20              THE COURT:  Your name, please.

21              THE WITNESS:  Nurry Blanco.

22              THE COURT:  You are his wife?

23              THE WITNESS:  Yes, sir.

24              THE COURT:  Anything you care to say?

25              THE WITNESS:  Yes, sir.
```

```
 1              THE COURT:  Go ahead.

 2              THE WITNESS:  My husband is not a bad man.  What

 3    he told you is the truth.  But you're the judge, and you

 4    have to do what you have to do, but please have mercy.

 5              THE COURT:  All right, thank you.

 6              THE WITNESS:  Thank you.

 7              THE COURT:  Anyone else?

 8              Your name, please.

 9              THE WITNESS:  My name is Ricardo Garcia.  I am

10    Nurry Blanco's oldest son.  All I can speak to is to the

11    matter of my mom suffered for many years in an emotionally

12    abusive relationship with my stepfather, James Earl

13    Peterson.  I have never known Mr. Blanco to be anything

14    other than a loving and considerate husband towards my

15    mother.  That's all I have ever witnessed from him and

16    nothing to the contrary of that fact.  I humbly beg this

17    Court to have mercy upon this man.  Thank you.

18              THE COURT:  Thank you.

19              Anything further?

20              MR. FURR:  Judge, we don't see the likes of this

21    Defendant here very often.  This is somebody you might see

22    in the State more often than here.  It is a truly violent

23    bad guy.  It's a wasted life, without any question.  And I

24    see nothing from this case or from the demonstration in here

25    today that he's any different.
```

```
 1              He came in here, looked us in the face, and just
 2   tried to lie his way out.  I would ask you give him 405
 3   months.  I still think straight life is better.  You can do
 4   that --
 5              THE COURT:  Hold on.
 6              MR. FURR:  I'm not going to make that argument.
 7   I'm not making that argument, 405 months and -- but he
 8   deserves every day of it.
 9              THE COURT:  I'm sorry?
10              MR. FURR:  He deserves every day of it.  Thank
11   you.
12              THE COURT:  You're welcome.
13              Well, I considered the advisory sentencing
14   guidelines and statutory factors.  One could reasonably
15   argue, given his history and the characteristics and the
16   nature of this crime -- it's not a victimless crime.  We
17   know that someone was victimized.  That is Dr. Taylor and
18   his family with regard to the theft of his jewelry and these
19   firearms.
20              It's reasonable to assume that had Mr. Alexander
21   and Mr. Blanco not -- was not dealing with an undercover
22   agent and was dealing with someone who truly wanted these
23   firearms, those firearms would have been distributed into
24   this community to the lower elements of this community and
25   would have been used to victimize other people.  It's a
```

1   serious, serious offense.

2          When you look at his history and his

3   characteristics, he's just not a nice man.

4          Mr. Blanco, you may be nice to your wife and

5   stepson and everything, but you -- you're a threat to

6   society.

7          He hasn't been deterred by virtue of the sentences

8   previously imposed upon him for violent crimes.  He's

9   clearly a danger to the community.

10          And taking into account all the statutory factors

11   that promote respect for the law, et cetera, I think an

12   upward variance would be in order.  I'm not going to do

13   that.  I'm going to stay within the guidelines, and I will

14   show him a little mercy.  I will give him the bottom of the

15   guidelines, which is 360 months, which is 30 years.  So, by

16   the time he's released from prison, he'll be approaching 80.

17   Hopefully by that time he won't be a menace anymore.

18          Do you have any recommendations -- well, I'm

19   sorry, not the bottom of the guidelines; I think it's the

20   mid range, 360 months.  I'm going to stay within the

21   guideline range.

22          Do you have any recommendations you wish me to

23   make to the Bureau of Prisons?

24          MR. FERLITA:  Coleman, Your Honor.

25          THE COURT:  I'll recommend Coleman.

1          If there's nothing further, it's the judgment of

2    the Court that the Defendant is hereby committed to the

3    custody of the Bureau of Prisons, to be imprisoned for a

4    term of 360 months, or 30 years.

5          Upon release from imprisonment, he shall serve a

6    five-year term of supervised release.  While on supervised

7    release, he shall comply with the standard conditions

8    adopted by the Court in the Middle District of Florida.

9          Having been convicted of a qualifying felony, he

10   shall cooperate in the collection of DNA as directed by his

11   probation officer.

12         The mandatory drug-testing requirements of the

13   Violent Crime Control Act are waived.  I'll direct, however,

14   that he submit to random drug testing, not to exceed 104

15   tests per year.

16         Based on his financial status, I waive imposition

17   of a fine.  I'll direct, however, that he pay the

18   United States a special assessment of $100, which shall be

19   due immediately.

20         After considering the sentencing guidelines and

21   advisory recommendation, the minimum mandatory sentence

22   required by statute, and all of the factors identified in

23   Title 18 of the United States Code, Section 3553(a)(1)

24   through (7), I find that the sentence imposed complies with

25   the purposes of sentencing set forth in that particular

```
 1   statute.
 2             I will accept the plea agreement.
 3             All right.  Do you renew your previous objection?
 4             MR. FERLITA:  Yes, sir.
 5             THE COURT:  Do you have any additional objections?
 6             MR. FERLITA:  Judge, just the objections to the
 7   enhancement that were placed on him here this morning.
 8             THE COURT:  All right.  I assume you object to the
 9   procedural and substantive reasonableness of my sentence?
10             MR. FERLITA:  Yes, sir.
11             THE COURT:  All right.  Any objections, Mr. Furr?
12             MR. FURR:  No, sir.  Thank you.
13             THE COURT:  All right.  I will remand him to the
14   custody of the United States Marshal Service to await
15   designation by Bureau of Prisons.
16             Mr. Blanco, to the extent your plea agreement may
17   permit it, you have the right to appeal from my judgment
18   within 14 days from today's date.  If you fail to appeal
19   within that period of time, that will be a waiver of your
20   right to appeal.
21             I will also advise you that you are entitled to
22   the assistance of an attorney in taking an appeal.  If
23   you're unable to afford one, I will provide one to you at no
24   charge.
25             Finally, if you're unable to afford the Clerk's
```

```
 1    filing fee, I will direct the Clerk of the Court to accept

 2    your notice of appeal without prepayment of that fee.

 3            I will recognize the existence of a waiver-

 4    of-appeal provision in the plea agreement.  I don't find

 5    that any of the four exceptions apply; but, nevertheless,

 6    under the Eleventh Circuit precedent, Mr. Ferlita, if he

 7    tells you to file a notice of appeal, you have to file a

 8    notice of appeal.

 9            MR. FERLITA:  Judge, I've already been instructed

10    to do that.

11            THE COURT:  Okay.  Well, that's what you want to

12    do?

13            THE DEFENDANT:  Yes, Your Honor.

14            THE COURT:  Well, I'm going to find him to be

15    indigent for purposes of appeal.  I'm going to appoint you

16    to represent him for purposes of appeal.  Go ahead and file

17    it.  I will leave it to the Government to file its standard

18    motion to dismiss based on the waiver-of-appeal provision in

19    the plea agreement, along with the transcript of the plea --

20    proceedings, and I'll leave it up to the wisdom and

21    hopefully good common sense of the Eleventh Circuit to

22    determine whether I did a good job in that regard.

23            All right, thank you.

24            Marshal, be sure to tell whoever's transporting

25    him back to Pinellas County to make sure those doors are
```

```
1    locked.  I don't want him to fall out on Interstate 4.

2              (Adjourned at 10:47 a.m.)

3                    - - - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                   CERTIFICATE OF REPORTER

2

3

4         I, SHERRILL L. JACKSON, Federal Official Court

5  Reporter for the United States District Court, Middle

6  District of Florida, Tampa Division,

7        DO HEREBY CERTIFY, that I was authorized to and

8  did, through use of Computer-Aided Transcription, report in

9  shorthand the proceedings and evidence in this cause, as

10  stated in the caption on page 1 of this transcript, and that

11  the pages numbered 1 to 63, inclusive, constitute a true and

12  correct transcription of my shorthand report of said

13  proceedings and evidence.

14        IN WITNESS WHEREOF I have hereunto set my hand

15  this 9th day of October, 2011.

16

                        *s/Sherrill L. Jackson*

17                _____

                    SHERRILL L. JACKSON, RPR, FPR

18               Federal Official Court Reporter

19

20

21

22

23

24

25